22-1766 and 1767 Thank you so much. Yes, your honor. Good morning. My name is Hudson Ellis. I represent the plaintiff and appellant Daniel Kessler. Certainly. There are three key issues that we raised in the briefs in the respective cases. There's two cases involved here. One issue is only related to the life insurance claim. I'm going to address the first two primarily. And if I have time, I'll get to the next. The first issue is whether or not it was error and reversible error for the court to rely on a post hoc rationale and upholding Hartford's decision. The second is whether Hartford should have been upheld, even though it did not consider the subjective symptoms of my client that everybody agreed he has. As to the first issue, in ERISA, one of the statutory requirements is that the insurance company, which is a fiduciary, must identify specifically the rationales for why they're going to deny a claim beforehand, because that's a fairness issue is a closed record when you get to court. And once you're in court, if their attorneys, very intelligent attorneys, identify additional reasons for denying the claim and try to base or shore that original decision up, that's unfair to the claimant who now doesn't have an opportunity to introduce additional evidence. But you're not disputing that Dr. Emmons' statement about Dr. Ortega agreeing with him was in the administrative record. Is that correct? No, that is in the administrative record. So then if that's the case, how can we have a post hoc justification if it was in the administrative record before Hartford made the decision? Well, it comes down to what was the basis of the decision. There's a lot of evidence in the administrative record, the ERISA record, but the rationale that Hartford proposed was that the clinical evidence did not support his disability. Didn't Dr. Emmons also talk about the severe chronic pain, the functional impairment, but that didn't preclude him from performing full-time duty? I think that actually goes to the second issue more, but it is true that every single doctor that Hartford hired considered his pain, found it credible, found the subjective symptoms that he complained of credible completely, that he was on strong narcotic pain medication. The question is not was he in pain. The question is could he not work. Right. And the occupations that they had to identify were occupations that would earn him $152,000 or more. So this isn't just can he be a greeter at Walmart. This is a can he go back and earn a substantial wage at an occupation. And for the occupations that they did identify, which were all executive level, executive vice presidents, executive managers, all SVPA according to the Dictionary of Occupational Titles, which is the second most skilled occupational classification provided. Those occupations all require. What I'd be interested in hearing from you is I think there's a difference between us being in a position to agree with them or not. But you're trying to you're trying to cabin the error that you ask us to find under a post hoc rationalization. And what you just said a moment ago sounds like you just think that they're wrong as opposed to it being post hoc. Well, that's actually why I think that whether they're wrong in ignoring that evidence goes more to the second issue, which is whether they appropriately considered these subjective symptoms. The post hoc issue is that the court found a statement from Dr. Emad that had never been identified by the administrator in the administrative record. They didn't identify in either one of their decisions or any of their decisions as a basis for supporting their decision. They didn't identify it in their briefing in court. So this isn't even a situation where the defendant in their briefing said, well, hey, there's this additional evidence. This was completely under the radar from any perspective whatsoever. Not even an oral argument. Dr. Licklaw's opinion was in the administrative record, too. Is that correct? Yes, it was, Your Honor. Okay. So, again, how is this post hoc if all of this stuff was in the record? It goes down to what was their basis for a decision. And that's what this court must consider is what was their basis for a decision. They can't go into court and say, well, we decided this case based on this evidence, these opinions. These opinions support our decision. And then all of a sudden in court come around and say, oh, well, actually, no, these other opinions are also in support. And here's another basis for finding the defendant's decision to be reasonable. And I think if you look at the Ninth Circuit's recent published decision in Collier, you'll find that that similar issue arose. The defendant denied the claim based on a finding that he was not disabled under the terms of the plan. And in that case, the defendant tried to argue in court that it was actually a credibility issue. Hey, he wasn't credible. And they said, well, this should be considered by the court because this isn't really a new argument. Credibility is a part of whether he's disabled. And the Ninth Circuit said, no, credibility was never an issue down below. You never questioned his credibility. And in a similar vein, and so they didn't allow that post hoc rationalization. In a similar vein, here, the judge found three separate key findings based on this statement by Dr. Emad that was completely unsupported anywhere else in the record. But she found it was reasonable for them to discount Dr. Ortega, his treating neurologist, because she had waffled apparently. Discount Dr. Berkowitz's treating pain management because he relied partially on Dr. Ortega. And then also to undergird their own doctor support because, hey, their treating physicians had not been consistent. And so this basically undergirded her entire opinion where it was based on a statement that had never been relied on, never been cited to anywhere else, anywhere in the record. So that's the post hoc issue. As far as the subjective symptom issue, Your Honor, I think that independently is another error that requires reversal. Because in this case, unlike a lot of cases where there's a dispute about whether the subjective symptoms were actually there, in this case, there's no dispute about that. Every single doctor, Hartford's doctors, Social Security, of course, Mr. Kesson's own doctors all agree he's under significant pain. He had a significant progression. It's supported by MRI results. He's on pain medication that's extremely heavy. And because- I guess I just don't understand how that doesn't cut against you. If all seven of the independent physicians addressed at least one of his non-exertional limitations, such as fatigue, such as concentration, or such as pain, then why isn't it just a matter of you disagreeing with how the evidence was weighed? Well, it was not weighed. The problem is that when each one of their physicians agreed to those restrictions and those symptoms, that information was never provided to the vocational consultant who identified the occupations. They were never provided any information about him being in severe pain, having low concentration, and fatigue. And that was actually after we had specifically alerted them to that issue. So it was purposeful. In fact, Hartford had even said in his denial letter, because of this pain, because of this narcotics, he's going to have to have additional time when dealing with cognitively demanding tasks. That was never told to their vocational consultant. The vocational consultant got strictly information about can you lift, can you sit, can you stand for certain periods of time. They were never told that he was suffering from severe pain. And when they were told that limited bit of information, they spit out that he could perform the CEO, VP, executive manager positions that are, frankly, more skilled than I could ever be. So for that reason, anyway, I'll reserve the rest of my time now. Thank you. Thank you, Your Honor. I think Your Honor hit the nail on the head with the question about how the peer reviews hurt rather than help the appellant in this case. Each of the peer reviews acknowledged the complaints and the symptomology that Mr. Kesson was reporting. But Mr. Kesson knew from the Snyder peer review, day one, the original peer review, he knew. Dr. Snyder said, there's no neuropsychological testing. I can't assess executive functioning. I see these complaints. There's nothing in the record. And right after that, his neurologist, Dr. Ortega, after an appointment with Mr. Kesson and his wife, refers Mr. Kesson for a neuropsych workup, and he doesn't get it. So from 2017 until the close of this administrative record, it's been clear, yeah, there are complaints about neuropsychological and cognitive impairments, but there hasn't been any evidence submitted as a part of that. Did Hartford give the full report to the consultant? So Hartford gives the restrictions and limitations that are recommended by the physician reviewer to the vocational evaluator. I'm sorry. The question I asked was about the report. No. So the full report with all the clinical findings would not go to the vocational reviewer because the vocational reviewer isn't responsible for making a medical determination about, here's a subjective complaint about pain. I think that that will mean, I, the vocational reviewer, that perhaps he'll be impaired 20% of the time in executive functioning. The vocational reviewer doesn't have any specialty or specialized knowledge to make that determination. That determination is done by the physician reviewers. And here we have seven physician reviewers who all provided essentially the same restrictions and limitations related to the clinical records and related, taking into account, to the symptomology that was complained of but really wasn't documented anywhere. And so that's really the issue when it comes to the vocational review. And if you look at Mr. Kesson's vocational review, it starts at appendix 3353. What their reviewer actually does is what no reviewer should do. Their reviewer says that she adjusted her vocational evaluation, and this appears at 3353, for severe pain and poor concentration because Mr. Kesson would likely have difficulty synthesizing, integrating analyses to discover facts, coordinating, determining time, place, sequence, operations, analyzing, examining, and evaluating data. Then she says, after adjusting for these limitations, she's not a doctor. There's no basis for her to do that. But that's the basis of Mr. Kesson coming to the court and saying that essentially, well, Hartford disregarded these complaints of pain. Hartford told Mr. Kesson, and by the way, a letter went to Dr. Ortega, that Dr. Snyder reviewed the record and there's no neuropsych workup. It easily could have been provided. It was referred, and he still chose not to do it. In terms of the post hoc rationale argument, there are two elements, or there are two facets to Mr. Kesson's post hoc rationale argument. The first one is that the court engaged in post hoc rationalization, and the second one is that Hartford Life, and I'm referring to Aetna and Hartford Life as one and the same here, that Hartford Life engaged in a post hoc rationale. We disagree with the proposition that the court can engage in post hoc rationalization on a stipulated record. A post hoc rationalization is a new rationale provided for the first time in litigation that was not covered in the administrative process. And, for example, we both cite the Needle case that came up out of the District of Connecticut. And in Needle, that was a health benefit dispute. And over the course of the health benefit claim and the administrative process, the administrator said, oh, this isn't medically necessary. Then in litigation, the administrator said, well, actually, it's not approved by the FDA, so we're going to deny it for that reason. It's a 180 complete departure from the rationale provided in the record, as Your Honor was alluding to. Here we don't have a 180 departure. We have a dispute between attorneys about what each piece of evidence in the administrative record means relative to the conclusion that Mr. Kessin did not satisfy the test of disability, did not submit sufficient evidence of functional restrictions and limitations that would impair him from sedentary work. You know, if you take it to its logical and proximate conclusion, the argument that Mr. Kessin is really making is that an adverse benefit determination issued in the administrative process should anticipate and list out the administrator's interpretation of each line of each record. The record is some 6,000 pages long here. I mean, first that anticipates that the administrator is anticipating a result, that they're anticipating a denial, which is not true. They're evaluating the evidence until it's time to make the decision. But above and beyond that, it would make no administrative or practical sense for an administrator to list out on February 18th. But I think part of the challenge is that there were seven positions. They agreed that his subjective symptoms were supported by objective evidence, and yet they still determined that he was not disabled. And the question is, is that in the face of those two things, seven and all of them agreeing, why isn't that arbitrary and capricious at some point? Well, it's not arbitrary and capricious because they each recommended specific restrictions and limitations relative to the evidence that they did review. And they also acknowledged the complaints but noted that there was no clinical evidence supporting that. Pain definitely is a subjective consideration, absolutely, but it can be objectively measured in terms of how is pain affecting your functionality, how is pain affecting your cognition, right? So Mr. Kessin, his functional assessments, including Dr. Litlow's assessment, pretty much showed him with a functionality that was pretty consistent with Dr. Herza, Dr. Gratton. All of the reviewing physicians who actually looked at Mr. Kessin essentially said within the same ballpark he had the same level of functionality. Dr. Litlow then said, but given the possibility of absenteeism and these complaints of pain, I don't think he would be able to work. And this is what Judge Merriam went through at length. She wrote a 67-page decision on this, first going through the clinical evidence, that's Section 1B of her findings of fact, then separately going through the opinions of the treating physicians, which were retroactively made in response to interviews and forms given by Attorney Kessin to the treating providers, then Hartford Life's evaluation. For the LTD claim, this is a 65-page decision. This is a uniquely long decision in the LTD context that thoroughly reviews all of the evidence. And it's Mr. Kessin's burden on this appeal to show that the court committed clear error in making these findings of fact. That is a heavy burden to show clear error. But at the end of the day, the argument about the post hoc rationale is really, and you see it in the reply brief that was filed by Mr. Kessin, it's really a dispute that every piece of evidence that is considered needs to be analyzed and annotated in a decision letter. If you don't say how you interpret the evidence, you cannot dispute plaintiff's interpretation of that evidence at court. Can you address whatever you think needs to be addressed with respect to Demirovic? Sure. So Demirovic, the district court got it right that the waiver of premium definition of disability does not require a definition, or excuse me, a vocational assessment to establish what a gainful occupation is. The district court outlined a few different reasons why that is. One is the policy consideration that underlines Demirovic and Helms. I believe Helms was a 10th Circuit case that Demirovic was based on. The takeaway from Demirovic was an analysis of what any gainful employment means. And what the court said was that it means that the claimant needs to earn a reasonably substantial income rising to the dignity of an income or livelihood. And what the court was talking about in Demirovic was what the Helms court called a gainful occupation. And this is a gainful occupation analysis. Now the Helms court that Demirovic cites to also discussed nominal occupations. And Helms said, look, if you're dealing with long-term disability insurance, you're dealing with income insurance, income security. It can't mean, as attorney Ellis said, it can't mean that you are making $200,000 a year and because you earn 10, you don't get the certainty of your income insurance. That can't possibly be it. Gainful occupation needs to mean something. But here we don't have any gainful occupation test. We have a nominal occupation. And it's interesting because in Demirovic, the court actually said at the very end, plans may in appropriate cases choose to rely on medical vocational guidelines in determining eligibility for social disability benefits. And I thought that was interesting that the court noted that because there are a number of decisions from the Southern District of New York. There's another recent one from the Eastern District of North Carolina that do just that. That they say the Social Security Administration and the district court can take judicial notice of the fact that, quote, a full range of sedentary work includes all or substantially all of the approximately 200 unskilled sedentary occupations. I'll let you finish your sentence, sir. Administratively noticed in 20 CFR part 404, subpart 4, appendix 2, table 1. And just as a practical matter, if I may, Your Honor, if this case even was remanded, Mr. Kessin acknowledges in the LTD record in the Bradford vocational report that there are sedentary jobs in the workplace that he can perform, unskilled sedentary work. And Hartford also did an analysis. Thank you so much. Mr. Ellis, you've got two minutes. Thank you, Your Honor. It would help me at least if you responded to your colleague's interpretation of Demirovic. Yes, Your Honor, I will absolutely do that. A couple of quick points before I get to that. The question really comes down to, is it reasonable for an insurance company to say, my doctors agree with you that you have these restrictions? They've considered it. But then not to provide those restrictions to their vocational consultant who identifies the occupations. That's not consideration. Fine, the doctor has considered it and agreed with it. But unless you actually make the connection and provide it to the person who's going to identify the occupations, that's not an appropriate review. That's not consideration under Connors. And also, as to the point about the neuropsych, even their own doctor says, this is not a neuropsych issue. You do not have to have a neuropsych doctor evaluate somebody in order to tell you that they have impairments related to their cognition. Every single one of their own doctors says he is impaired as far as his cognition, including providing a specific limitation related to the cognitive demand type work. So there's that. As far as Demirovic, I think, first, Demirovic does not say it only applies to income protection. What they're trying to introduce is a standard where the same policies, the same language, get different treatment and different interpretation based on whether they're an income protection disability policy or a life insurance disability policy. And what's the problem with that? I mean, I think they would agree that the language, while not being lockstep, is close. But the differences matter given the function. Well, the differences in the language matter. But if you've got identical language, the fact that it's covering a different benefit type should not matter. You can't have different interpretation of the same language for two different policies just because they cover a different type of benefit. But as far as what they're trying to distinguish, as far as Demirovic was dealing with a gainful occupation policy versus this one dealing with what they say is more of any occupation type of policy, this is actually more specific than Demirovic was. They cut out from the definition in the life insurance policy any reasonable job. That's not quoted in their brief or the district court's opinion. Any reasonable job, and that also includes any job that you are or reasonably can become fitted by training, education, and experience. How are they supposed to determine whether he is able to perform that occupation, that specific reasonable job based on his education, experience, and training, unless they have somebody to tell them what vocationally that would mean? And they didn't do that. Thank you so much. We appreciate it. We'll take the case under advisement. Thank you, Your Honor.